# EXHIBIT 15

Robert Andres Fisher

```
 1              UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
 2

 3                        - - -

 4
    NIRVANA, L.L.C.,            :   CASE NO. 2:18-CV-
 5             Plaintiff,       :   10743-JAK-SK
                               :
 6        vs.                   :
                               :
 7  MARC JACOBS INTERNATIONAL   :
    L.L.C., et al.,             :
 8             Defendants.      :
    _____ :
 9  MARC JACOBS INTERNATIONAL   :
    L.L.C., et al.,             :
10             Counterclaim    :
               Plaintiffs,      :
11                             :
          vs.                   :
12  NIRVANA, L.L.C.,           :
               Counterclaim    :
13             Defendant.       :
14
                          - - -
15
      REMOTE VIDEOTAPED DEPOSITION OF ROBERT ANDRES FISHER
16
                  Thursday, August 27, 2020
17
18                        - - -
19
20
21
22                        - - -
23           GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 971.591.5672 Fax
24              deps@golkow.com
25
```

Robert Andres Fisher

1           Remote videotaped stenographic deposition of

2    ROBERT ANDRES FISHER, conducted at the location of the

3    witness in Woodland Hills, California, commencing at

4    approximately 10:03 a.m., on the above date, before

5    Rosemary Locklear, a Registered Professional Reporter,

6    Certified Realtime Reporter and California CSR (#13969).

7

8                           - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Robert Andres Fisher

```
 1    APPEARANCES:   (All appearances via remote technology)

 2

 3          KENDALL BRILL & KELLY, L.L.P.
            BY:  BERT H. DEIXLER, ESQUIRE
 4          bdeixler@kbkfirm.com
            BY:  SARAH E. MOSES, ESQUIRE
 5          smoses@kbkfirm.com
            10100 Santa Monica Boulevard, Suite 1725
 6          Los Angeles, California 90067
            (310) 566-2700
 7                and
            RIMON, P.C.
 8          BY:  MARK S. LEE, ESQUIRE
            mark.lee@rimonlaw.com
 9          BY:  JILL H. BERLINER, ESQUIRE
            jill.berliner@rimonlaw.com
10          2029 Century Park East, Suite 400N
            Los Angeles, California 90067
11          (213) 375-3811
            Appearing on behalf of the Plaintiff and
12          Counterclaim Defendant

13

14          KELLEY DRYE & WARREN, L.L.P.
            BY:  KERIANNE LOSIER, ESQUIRE
15          klosier@kelleydrye.com
            BY:  MICHAEL ZINNA, ESQUIRE
16          mzinna@kelleydrye.com
            BY:  STEPHANIE A. GROB, ESQUIRE
17          sgrob@kelleydrye.com
            101 Park Avenue
18          New York, New York 10178
            (212) 808-7800
19          Appearing on behalf of the Defendant and
            Counterclaim Plaintiff
20

21

22

23

24

25
```

```
 1   APPEARANCES:  (Continued)

 2

 3           MODO LAW
             BY:  INGE DE BRUYN, ESQUIRE
 4           inge.debruyn@modo-law.com
             4218 Via Padova
 5           Claremont, California 91711
             (424) 832-6118
 6           Appearing on behalf of the Intervenor, Robert
             Fisher

 7

 8
                             - - -
 9

10

     ALSO PRESENT:
11

12
             JOSEPH MOURGOS, Video Operator
13
             GINA VELDMAN, Trial Technologist
14
             MICHAEL MEISEL
15

16
                             - - -
17

18

19

20

21

22

23

24

25
```

Robert Andres Fisher

```
 1                    I N D E X

 2

 3   WITNESS                                    PAGE

 4

 5   ROBERT ANDRES FISHER

 6

 7             By Mr. Zinna                      10

 8

 9             By Mr. Deixler                    149

10

11                    - - -

12

13             EXHIBIT INDEX

14   NUMBER                                    MARKED

15

16   1        3-page document dated 8/19/20      14
              entitled "Second Amended
17            Notice of Subpoena to Testify
              at a Deposition of Robert
18            Fisher," plus attachments

19   2        16-page document dated             18
              12/28/18 entitled "Complaint,"
20            plus attachments

21   3        1-page color photo dated           21
              3/11/93

22

     4        1-page copy of Page 3 of          22
23            Complaint

24

25
```

Robert Andres Fisher

```
 1                    EXHIBIT INDEX (Continued)
 2     NUMBER                                            MARKED
 3
 4     5              3-page document dated 8/10/20       23
                      entitled "Declaration of
 5                    Robert Fisher in Support of
                      Motion for Leave to Intervene
 6                    Pursuant to Fed. R. Civ. P.
                      24"
 7
       6              2-page color photos                43
 8
       7              4-page color photos                49
 9
       8              1-page color photos                55
10
       9              2-page color photos                67
11
       10             2-page email dated 11/27/19 to     80
12                    Robert Fisher from Mike
                      Wilkinson
13
       11             4-page email dated 11/27/19 to     82
14                    Michael Meisel from Robert
                      Fisher
15
       12             2-page color photos                105
16
       13             1-page color photo,                111
17                    MJI-Nirvana 000330
18     14             2-page color photos                116
19     15             1-page letter dated 3/9/93 to      118
                      Register of Copyrights from
20                    Deborah L. Benson, plus
                      attachments, NIRVANA-000041 -
21                    NIRVANA-000044
22     16             1-page document dated 8/10/20      122
                      entitled "Certificate of
23                    Registration"
24     17             2-page color photos                125
25
```

Robert Andres Fisher

```
 1                   EXHIBIT INDEX (Continued)
 2    NUMBER                                            MARKED
 3
 4    18              1-page document entitled            129
                      "Geffen Records Packaging
 5                    Budget"
 6    19              26-page document dated 8/11/21      133
                      entitled "[Proposed]
 7                    Complaint-In-Intervention for
                      Declaratory Relief; Injunctive
 8                    Relief; Breach of License;
                      Copyright Infringement; and
 9                    Cancellation of Federal
                      Trademark Registration"
10
      20              17-page document dated 8/10/20      135
11                    entitled "Memorandum of Points
                      and Authorities in Support of
12                    Motion to Intervene"
13    21              1-page document dated 1/22/20       138
                      entitled "Acknowledgement,"
14                    NIRVANA-001840
15    22              3-page document dated 10/11/19      140
                      entitled "Acknowledgement,"
16                    NIRVANA-000328 -
                      NIRVANA-000330
17
      200             1-page color photos                170
18
      201             1-page document entitled           198
19                    "Instagram"
20    202             1-page document entitled           200
                      "Instagram"
21
      203             1-page document entitled           201
22                    "Instagram"
23    204             1-page document entitled           203
                      "Instagram"
24
25
```

Robert Andres Fisher

```
 1                      EXHIBIT INDEX (Continued)

 2    NUMBER                                          MARKED

 3

 4     205              1-page color photo,              207

                        NIRVANA-114261

 5

 6

       (Exhibits retained by the court reporter and attached to

 7    transcript.)

 8

 9                              - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Robert Andres Fisher

```
1    Q.       And tell me how that relationship began.

2    A.       Well, I was a fan of the band.  I had seen them

3    play live before.  And I heard that we were going to

4    sign them.  There was a rumor going around.  So I went

5    down to the creative director's office and asked if I

6    could work with them.

7    Q.       And who was that creative director?

8    A.       I believe at that time it was Robin Sloane.

9    Q.       And how did she respond to your request?

10   A.       She said, "Sure."  She thought it was great I

11   was a fan.  It's always good when you like a band if you

12   work with them.

13   Q.       And was the -- was the obtaining of jobs, you

14   know, particular assignments with Geffen, that informal?

15   You would walk into, you know, a creative director's

16   office and say, I want this, and they would say, yes,

17   no, but it was pretty much that was how it went?

18   A.       Yeah, usually.  If they were a very big,

19   established band, they might give it to a person they

20   thought went their style or something, but the new

21   bands, if you want -- if you really wanted to work with

22   them, you could usually just ask.

23   Q.       And at that time, when you -- when you went into

24   Ms. Sloane's office and asked for this responsibility,

25   did you know or did she tell you what that role would
```

Robert Andres Fisher

1   entail?

2   A.      Not -- I don't believe she would have had to.   I

3   would have known what to expect at that point.

4   Q.      And so what would that have been?

5   A.      Developing their package for their album

6   release, and then it would include singles and

7   everything that went along with that.

8   Q.      And you testified earlier that in this more sort

9   of -- can I call it a senior role?  Does that make

10  sense?

11  A.      Well, it's more senior from when you first

12  start, but then once it's -- it's just what everybody

13  was.  The only senior person would have been the

14  creative director.

15  Q.      Got it.

16          So when you're -- when you're in this role now

17  where -- I'll call it where you have your own bands that

18  you're working with.

19  A.      Uh-huh.

20  Q.      Does that make sense?

21  A.      Yeah.  You can call it art director.

22  Q.      Oh, art director.  Okay.

23          So when you're in this art director role, is one

24  of the job responsibilities actually creating the

25  artwork or are you finding people more to do things?

Robert Andres Fisher

```
1    know, crazy spiral eyes, and other things.

2           So, you know, it's experimenting around.  So it

3    could be a day or two.

4    Q.      And do you remember where you were when you

5    created it?

6    A.      Did the drawing?

7    Q.      Yes.

8    A.      Not really.

9    Q.      Would you have been at -- well, do you know if

10   Nirvana had an official office or business location at

11   that time?

12   A.      I don't think Nirvana did.

13   Q.      So then you wouldn't have been at, like,

14   Nirvana's office when you created this; is that correct?

15   A.      No.  No.  That would be -- like you're referring

16   to the management company's office?

17   Q.      Well, however you understand it.

18   A.      Okay.  Yeah.

19           Nirvana itself I don't believe had an office,

20   but it would have been like -- I don't know, what was

21   it? -- Gold Mountain or John Silva's office.  But, no,

22   it was not there.

23   Q.      And did you ever -- did you ever draw at home?

24   A.      Uh-huh.

25           Excuse me.  Yes.
```

Robert Andres Fisher

```
 1   Q.      And so do you know if this was drawn in your

 2   home?

 3   A.      I'm -- I don't remember.

 4   Q.      And do you know if anybody else was with you

 5   when you -- when you drew the original drawing?

 6   A.      I don't -- I don't think so.

 7   Q.      And was there anyone with you when you made the

 8   Xerox?

 9   A.      There could have been people standing around.

10   No one that I -- that comes to mind.

11   Q.      And what -- so what caused you to make the, I

12   guess, creative decision to enlarge it in that way?

13   A.      Well, as I said, that was the technique to get

14   the lines.  You know, when you draw it small, then the

15   lines are all wavy and kind of, you know, crooked, you

16   know, rough around the edges.  So that's why I blew it

17   up.

18   Q.      And do you remember when the original drawing

19   was created?

20   A.      No.

21   Q.      Okay.

22           MR. ZINNA:  Gina, would you please pull Tab G,

23   and mark it as Exhibit 7.

24           (Exhibit 7 was marked for identification.)

25           MR. ZINNA:  Thank you.
```

Robert Andres Fisher

```
1    BY MR. ZINNA:

2    Q.      So, Mr. Fisher, I'm showing you now a document

3    that's been marked as Exhibit 7 that was produced by you

4    in response to the defendants' Subpoena.

5            Have you seen this document before?

6    A.      Yes.

7    Q.      What is it?

8    A.      That is a request to use the new T-shirt design

9    from -- I believe -- they were making shirts to send out

10   to radio and they wanted to use the design for that to

11   send out 1,400.

12   Q.      So is it like a --

13   A.      I would call it like an initial request.

14   Q.      Okay.  I think it's been referred to as like a

15   promo T-shirt manufacturing price quote.

16           Is that what it is?

17   A.      Well, the page we're looking at now is just like

18   I guess them figuring out how many they needed to order

19   or how many they wanted to make.

20   Q.      I see.

21           MR. ZINNA:  So, Gina, if you could, can we just

22   please pull up each of the pages of this document.

23   BY MR. ZINNA:

24   Q.      And, Mr. Fisher, after you've had a chance to

25   look at it, I want to ask you about the document as one,
```

Robert Andres Fisher

```
 1   is that list here?
 2          It looks like it says, Metal Doc, Metal B, and
 3   then I can't really --
 4   A.      Yeah.
 5   Q.      -- ascertain what it says.
 6          Do you know what it says here?
 7   A.      I believe it's the -- I'm not sure if it's
 8   magazines or radio stations or something, that they were
 9   going to -- they were kind of getting a count of how
10   many they wanted to send to each division or something.
11   Q.      Okay.  And at the top, does it say Nirvana
12   T-shirt-Radio Lists and -- I can't make out that last
13   word.  Do you know what it is?
14   A.      It might be Lists and Sales.  Or Hits and -- I
15   can't read it either.
16   Q.      And underneath that, it says, P-R-O-D, period,
17   Cost; is that correct?
18   A.      Yes.
19   Q.      Do you know if that means production costs?
20   A.      I would guess that, yes.
21          MR. DEIXLER:  Move to strike the answer.  No
22   foundation.
23   BY MR. ZINNA:
24   Q.      And if we -- if we move to Page 3 of this
25   document, do you see in between Flower Sniffin, Kitty
```

Robert Andres Fisher

1    Pettin, Baby Kissin, Corporate Rock Whores, and the

2    handwriting that you said is yours at the bottom where

3    it says, "Nirvana Tee Shirt (Back)," do you see a little

4    logo there?

5    A.      Yes.

6    Q.      Do you know what that is?

7    A.      That's the DGC logo, the other offshoot of

8    Geffen.  Geffen Record Company or DGC.

9    Q.      And did you create this document?

10   A.      Yes.

11   Q.      And why would you have put the DGC logo there?

12   A.      I believe because this version of the shirt,

13   since DGC was giving them out, they asked to have their

14   logo on it.

15   Q.      Okay.

16           MR. ZINNA:  And if we go to the next page,

17   please.

18   BY MR. ZINNA:

19   Q.      Do you know what this document is?

20   A.      This looks like a quote for the actual printing

21   of the shirts from a printer.

22   Q.      And do you see that it's dated July 26th, 1991?

23   A.      Yes.

24   Q.      So does that help refresh your recollection

25   about when the smiley would have been created?  Would it

Robert Andres Fisher

1  have to have been at least by this date?

2  A.      Yeah.  It would have been just before this a

3  bit.

4  Q.      And why was the smiley face originally created?

5  Like, what was the original purpose for you drawing it?

6  A.      Well, what I remember is that Nirvana, being

7  management or band, but which I -- they wanted -- they

8  had an old tour shirt that was -- it had the writing on

9  the back that was kind of explicit.

10         And they wanted to make a new shirt that they

11  could sell and -- you know, like a new promo shirt they

12  could promote themselves with at -- you know, sell on --

13  in concerts, and possibly in retail, and stuff like

14  that.

15  Q.      And -- but -- so did you draw it for some other

16  purpose, but it ended up being used on the T-shirt Or

17  are you draw --

18  A.      Well, I originally drew it for a T-shirt for

19  Nirvana, and then, I guess, this -- the -- this

20  department saw it and wanted to use it for one of their,

21  like, special promos.

22  Q.      Okay.  Had you drawn smiley faces prior to

23  drawing the one we've been talking about here?

24  A.      Yes.

25  Q.      Prior to your work with Geffen?

Robert Andres Fisher

1    A.      Yes.  And in art school I used -- I used to

2    doodle them quite a bit.

3            MR. ZINNA:  Gina, will you please pull Tab F,

4    and mark it as Exhibit 8.  F, as in Frank.

5            (Exhibit 8 was marked for identification.)

6    BY MR. ZINNA:

7    Q.      So, Mr. Fisher, you're looking at what has been

8    marked as Exhibit 8, and it was a document produced by

9    you in response to the Subpoena issued to you by the

10   defendants.

11           Have you seen this document before?

12   A.      Yes.

13   Q.      What is it?

14   A.      These are, I guess you'd call them video

15   captures from a video in my last year at Otis-Parsons of

16   the -- some of the smiley faces that I used to draw

17   around.

18   Q.      And what year was that?

19   A.      It says May 2nd, 1989 --

20   Q.      Oh, okay.

21   A.      -- on the --

22   Q.      So all these four stills are from the same

23   video?

24   A.      Yes.

25   Q.      And are you in possession of the video that

Robert Andres Fisher

```
 1    these stills were taken from?

 2    A.      Yes.

 3    Q.      And when did you come into possession of that

 4    video?

 5    A.      I've had it since then.

 6    Q.      And it's been in your possession since then.

 7    A.      Yes.

 8    Q.      Did you -- well, is that you in the bottom

 9    picture?

10    A.      Yes.

11    Q.      So --

12    A.      The good-old days.

13    Q.      Yeah.

14            So did you create the video or did you use it

15    or observe --

16    A.      I had -- I believe it was my -- like, the last

17    couple weeks of my senior year, and I borrowed a

18    friend's -- you remember the big, old video cameras.

19            And I borrowed that, and just went around and

20    filming in all my classes, and had friends filming each

21    other, and stuff like that.  So, yes.

22    Q.      And did you take these screen captures?

23    A.      Yes.

24    Q.      And do they accurately reflect images from the

25    video, which you've said you've had in your possession?
```

Robert Andres Fisher

```
1    draw in your free time?

2    A.       Not regularly.

3    Q.       And --

4    A.       I would have mainly been concentrating on school

5    projects and, you know, graphic design for school

6    projects.

7    Q.       And if we just take -- start with the image at

8    the top, do you recall why you created that image?

9    A.       I do not.

10   Q.       And for the image in the middle, the smiley, the

11   red smiley that's located in the image in the middle

12   left picture, do you recall why you created that?

13   A.       Well, I -- what I remember from that room is,

14   the last week or so in your senior year all the walls

15   were white, and all the students would just go crazy and

16   spray paint and stencil and draw all over the walls and,

17   you know, just make the room crazy-looking.

18            So I believe some of those were part of that.

19   We had like free rein to graffiti and just paint the

20   hell out of the classroom.

21   Q.       But no rhyme or reason to why you would have

22   contributed a smiley face to that.

23   A.       I think I just used to like to draw them back in

24   the day.

25   Q.       So turning back to --
```

Robert Andres Fisher

```
 1   would have delivered this to Nirvana before this date?

 2   A.      Yes.

 3   Q.      And you said "them."

 4           Who at Nirvana or representing Nirvana would you

 5   have delivered it to?

 6   A.      Well, back then, I was mainly -- my main contact

 7   was John Silva.  And he had another person in his office

 8   that I remember dealing with, but I don't recall his

 9   name.

10           He would send me -- you know, we'd fax back and

11   forth things, and do the messengering and things.  But

12   it would have all gone to John Silva's office.

13   Q.      And I can represent to you -- and this was in --

14   right.

15           So this was in 1991; correct?

16   A.      Correct.

17   Q.      So I can represent to you that in 1991 an entity

18   existed called Nirvana, Inc.

19           Have you ever been employed by an entity called

20   Nirvana, Inc.?

21   A.      No.

22   Q.      And have you ever received any employment

23   benefits from a company called Nirvana, Inc.?

24   A.      No.

25   Q.      Have you received any compensation from a
```

Robert Andres Fisher

```
 1   company called Nirvana, Inc., at all?

 2   A.      No.

 3   Q.      We've been going for about an hour.  I'm okay,

 4   but are you okay or would you like a break?

 5   A.      I'm still good.  Thanks.

 6   Q.      Okay.

 7           MR. ZINNA:  So we can pull Exhibit 7 down now,

 8   please, Gina.

 9           And if you could put Exhibit 4 back up next to

10   Exhibit 6.  Page 1.

11           Thank you.

12   BY MR. ZINNA:

13   Q.      Is there a written agreement signed by you and

14   Geffen that would state that the smiley face here is a

15   work for hire?

16   A.      No.

17   Q.      Is there a written agreement signed by you and

18   Nirvana, Inc., stating that this agreement -- this

19   smiley face is a work for hire?

20   A.      No.

21   Q.      Is there any written agreement signed by you,

22   whether or not signed by anyone else, that states that

23   this smiley face is a work for hire?

24   A.      No.

25   Q.      Okay.
```

Robert Andres Fisher

1  Q.      And by "T-shirt design," you'll recall I said I

2  mean, you know, the graphics and the text together,

3  everything.

4  A.      Yes.  I put that all together.

5  Q.      Okay.

6          MR. ZINNA:  Gina, you can pull these down.

7          And please pull up Tab H, as in home, and mark

8  it as Exhibit 9.

9          (Exhibit 9 was marked for identification.)

10         MR. ZINNA:  Thank you.

11 BY MR. ZINNA:

12 Q.      So, Mr. Fisher, I'm showing you a document

13 that's been marked as Exhibit 9, which was produced by

14 you in response to the defendants' Subpoena.

15         Have you seen this document before?

16 A.      Yes.

17 Q.      What is it?

18 A.      That is one of the 1,400 shirts that was ordered

19 that I -- that I received as a sample.

20 Q.      So those are the 1,400 shirts that you said, I

21 think, were referenced in Exhibit 7 on that handwritten

22 note; correct?

23 A.      If 7 is, like, the print order and that, yes.

24 Q.      It is.  So, thank you.

25         And are you in possession of the T-shirt in

Robert Andres Fisher

```
 1   these pictures?

 2   A.      Yes.

 3   Q.      And when did you come into possession of that

 4   T-shirt?

 5   A.      When they were printed, which would have been

 6   after that one date on the note.  I'm not -- I'm not

 7   sure how long the printing time was, but since it was a

 8   small run, I'm sure it was pretty fast.

 9   Q.      And have you had it in your possession since

10   then?

11   A.      Yes.  Again, in a box.

12   Q.      And did you take this photo?

13   A.      Yes.

14   Q.      And is this the T-shirt design that you created?

15   A.      Yes.

16           MR. ZINNA:  Can we see the next page, please,

17   Gina.

18   BY MR. ZINNA:

19   Q.      So do Page 1 and Page 2 of this exhibit,

20   Mr. Fisher, represent the full T-shirt design that you

21   created?

22   A.      Yes.  With the addition of the logo on the

23   sleeve.

24   Q.      And is this the T-shirt design that we also have

25   been referencing back to in Exhibit 3?
```

Robert Andres Fisher

1   about the typesetting, if we -- it's right around the

2   time we started using computers, but really only for

3   typesetting.

4        So I'm not sure if I had the -- yeah, I probably

5   would have just done it on the computer and printed it

6   out, and then used the Xerox copy and cut it out, and

7   made the boards or the mechanicals, as we called them.

8   Q.   And did anyone at Nirvana, Inc., give you any of

9   the materials that you used to create this T-shirt

10  design?

11  A.   Not the materials, no.

12  Q.   How long did it take you to create the T-shirt

13  design?

14  A.   Like after the happy face was done?

15  Q.   Yes.

16       So how -- so how did it -- how long did it take

17  you to create the full design of this T-shirt?

18  A.   I'm not really sure.  I do remember that there

19  was some change on the copy on the back.  Like, maybe,

20  the "corporate rock whores" I did one way first and then

21  they asked -- they changed the wording a bit or

22  something.  But -- so it could have been a day or so.

23  Q.   And did someone ask you to create it?

24  A.   To create the shirt?

25  Q.   Yes.

Robert Andres Fisher

```
 1   A.      Yes.  I wouldn't have done it on my own.

 2   Q.      Do you remember who that was?

 3   A.      I don't exactly, but I'm -- if I had to guess, I

 4   would say management, because they -- they're the ones

 5   that had the idea to, you know, make a play on the other

 6   shirt, the other tour shirt.

 7   Q.      And do you know if the original use for this

 8   T-shirt was radio promotion?

 9   A.      That was the first sample I got.  So I'm not

10   sure when I sent the mechanicals off for Nirvana to use.

11   I don't know if I sent them to Nirvana or to their

12   printer.

13           But I never got a sample back from them.  So

14   this is the first time I ever saw it printed was the one

15   of the 1,400.

16   Q.      But do you recall that this shirt was sent to

17   radio stations?

18   A.      I would just have to assume that's what they

19   used it for.

20   Q.      And do you know how many units of this were sent

21   out?

22   A.      Well, I think the list is on that note or -- on

23   that one piece of evidence.

24           MR. ZINNA:  Can we pull up Exhibit 7, Page 1,

25   please, Gina.
```

Robert Andres Fisher

```
 1              THE WITNESS:  It looks like 1,305 were sent out,

 2   but then there -- it looks like at the bottom there's

 3   600 for, looks like, retail at Tower.

 4              So -- but then they were -- padding is, you

 5   know, a few extras.  Like, that would have been like one

 6   to give to me and some other people.

 7              MR. ZINNA:  Uh-huh.

 8              THE WITNESS:  So you could say close to 1,400

 9   were probably sent out.

10   BY MR. ZINNA:

11   Q.      And so do you know when those would have been

12   distributed?

13   A.      I wouldn't know that, no.

14   Q.      Do you know if it would have been before

15   November 1991?

16   A.      I wouldn't know, no.

17   Q.      Okay.  And who --

18              MR. ZINNA:  So getting back to, please, Gina,

19   Exhibit 3.

20   BY MR. ZINNA:

21   Q.      At roughly the time that you created this

22   T-shirt in 19 -- this T-shirt design in 1991, who knew

23   that you created it?

24   A.      I -- again, I would assume management company,

25   since I was working with them on it.
```

Robert Andres Fisher

1  Q.       And you mentioned earlier that you delivered the

2  design to someone associated with Nirvana, but I think

3  at that point we were talking just about the smiley

4  face.

5           So did you also deliver the whole design of this

6  T-shirt to them?

7  A.       Yes.  I would have -- I would have done a

8  mock-up and probably sent that -- sent them that to

9  approve.

10          And then once they said yes, then I would have

11  made a full-size mechanical of it, you know, with the

12  tracing paper and called out the colors, and then sent

13  them that, or if they would have directed me to send it

14  to a printer that they were using to make theirs.

15  Q.      And do you recall who exactly at Nirvana you

16  would have sent it to?

17  A.       Again, I would guess John Silva or his

18  assistant.

19  Q.      And would the -- would the order for the 1,400

20  shirts have been made and completed if it had not been

21  approved by Nirvana or their management?

22  A.       No.  They would -- the -- their management would

23  always have to approve it before it was used elsewhere.

24  If it's going to represent the band, they would approve

25  it.

Robert Andres Fisher

```
 1            MR. ZINNA:  Okay.  If we could, could we take

 2    just a -- well, do you want to maybe go -- I know it's

 3    going to be noontime by you guys in California soon.

 4            Do you want to go another half an hour or so and

 5    then take a more extended break, or do you want to

 6    stretch your legs?

 7            I just want to --

 8            THE WITNESS:  I'll do a half hour and then take

 9    a longer break.  Give me --

10            MR. ZINNA:  Okay.

11            THE WITNESS:  -- time to make some lunch.

12            MR. ZINNA:  That sounds good.

13            Okay.  So --

14            VIDEO OPERATOR:  We're off the record, then?

15            MR. ZINNA:  No.  No.  No.  We're going to go

16    about another half an hour and then we'll take a more

17    extended break.

18            VIDEO OPERATOR:  Okay.  I misunderstood.  Sorry.

19            Go ahead.

20            MR. ZINNA:  No problem.

21            Okay.  So, Gina, if you could, please, pull up,

22    I believe it's Exhibit 3 again, please.

23    BY MR. ZINNA:

24    Q.     So, Mr. Fisher, at the time that you created

25    this T-shirt design, you were not an employee of
```

```
 1   Nirvana, Inc.; is that correct?

 2   A.      Correct.

 3   Q.      And you've never been an employee of Nirvana,

 4   Inc.; correct?

 5   A.      Yes.

 6   Q.      Were you working with Geffen when this T-shirt

 7   design was created?

 8   A.      I was working at Geffen Records, yes.

 9   Q.      And were you working for anybody else at that

10   same time?

11   A.      I had various side projects and gigs that I was

12   working on.  You know, I was young and fresh out of

13   school, so I was looking for as much work as I could

14   get.

15   Q.      But none that related to this T-shirt design; is

16   that correct?

17   A.      Restate the question, then.

18   Q.      None of your side gigs were related to this

19   T-shirt design.

20   A.      Oh.

21   Q.      Correct?

22   A.      Yeah.  None of the other ones were, no.

23   Q.      And when you were -- when you were hired to work

24   with Geffen originally, was the company aware that one

25   of your skills would be creating T-shirt designs?
```

Robert Andres Fisher

1   A.      No.

2   Q.      And would you say that the scope of your work

3   with Geffen in 1991 would have included designing

4   T-shirts?

5   A.      It wouldn't be a main focus, no.

6   Q.      So if you elected not to create T-shirts, for

7   whatever reason, when working with Geffen, that wouldn't

8   cause you to like lose that position; is that correct?

9           MR. DEIXLER:  Calls for speculation.  No

10  foundation.

11          He's not an executive at Geffen.

12          THE WITNESS:  Can you restate the question,

13  please.

14          MR. ZINNA:  Sure.

15  BY MR. ZINNA:

16  Q.      Do you know, if you were not able to create

17  T-shirt designs for Geffen in 1991, that would have

18  adversely affected your employment?

19  A.      I don't think so.

20          MR. DEIXLER:  Objection.

21          THE WITNESS:  I mean, we did create shirts --

22          MR. DEIXLER:  Hold on.  Please, sir.

23          THE WITNESS:  -- like with graphics --

24          MR. DEIXLER:  Sir, let me -- let me state my

25  objection before you speculate here.

Robert Andres Fisher

```
 1   Q.      We'll get to Tab L in a second.

 2           But I want to start with this email we're

 3   looking at on Page 2 of Exhibit 10.  This is an email

 4   from Mr. Wilkinson to you on November 27th, 2019, at

 5   9:59 a.m.

 6           Do you see that?

 7   A.      Yes.

 8   Q.      And do you see that Mr. Wilkinson in his email

 9   mentions the lawsuit between Nirvana, L.L.C., and the

10   defendants?

11   A.      Yes.

12   Q.      And is this when you learned about this lawsuit?

13   A.      Yes.

14   Q.      So, now, if we look at Exhibit 11, which is a

15   document that you produced in response to the

16   defendants' Subpoena in this case, first, have you seen

17   this document before?

18   A.      Yes.

19   Q.      Is it a string of email correspondence between

20   you and Michael Meisel from February -- I'm sorry --

21   from November 27th, 2019?

22   A.      The one I'm seeing is just one email, my first

23   email to Michael.

24           MR. ZINNA:  Can you please scroll through this,

25   Gina.
```

Robert Andres Fisher

 1   BY MR. ZINNA:

 2   Q.     And, Mr. Fisher, let me know when you've

 3   reviewed all of these pages.

 4   A.     (Witness reviews document.)  I mean, were there

 5   three?  I've seen three now.

 6   Q.     Okay.  And so, as to Exhibit 11, did you

 7   personally receive or send each of these emails?

 8   A.     Yes.

 9   Q.     And who is Michael -- is it Meisel or Meisel?

10   A.     Meisel.

11   Q.     Meisel.

12   A.     I've always said Meisel.

13   Q.     Who is he?

14   A.     He was my go-to person for Nirvana.  He worked

15   in management.

16   Q.     And do you know if he was working with or for

17   Nirvana in 1991?

18   A.     I'm not sure of his start date, but it was

19   somewhere around then.

20   Q.     I think you testified earlier that you thought

21   it might have -- might have been post the release of

22   Nevermind; is that correct?

23   A.     Yeah.  I'm not sure if he came like right when

24   it was coming out or -- yeah, right around then.

25   Q.     Okay.  So we -- let's start with -- okay.

Robert Andres Fisher

```
 1   just a scramble --

 2   Q.      Yeah.

 3   A.      -- of -- it's been going on forever being stuck

 4   at home, so...

 5   Q.      I understand.

 6           So between mid-May 2020 and today, have you or

 7   your counsel had any conversations with Nirvana or its

 8   representatives about the subject matter of this

 9   lawsuit?

10   A.      I have not.  And I'm not a hundred percent sure

11   if she has or not.

12   Q.      And so if she has, you're not aware of the

13   substance of any of those communications; is that

14   correct?

15   A.      Not that I remember, no.

16   Q.      And you would ask her if you wanted to know.

17   A.      Yes.

18   Q.      So let's -- okay.

19           MR. ZINNA:  Gina, if you would, please, pull

20   Tab I, and mark it as Exhibit 12.

21           (Exhibit 12 was marked for identification.)

22           MR. ZINNA:  Thank you.

23   BY MR. ZINNA:

24   Q.      So, Mr. Fisher, I'm showing you a document

25   that's been marked as Exhibit 12, which is a document
```

Robert Andres Fisher

```
 1    that was produced by you in response to the defendants'

 2    Subpoena to you in this case.

 3            Have you seen this document before?

 4    A.      Yes.

 5    Q.      What is it?

 6    A.      It is a flyer I designed to get fans to come to

 7    their -- to be in their video shoot for their first

 8    video, "Smells Like Teen Spirit."

 9            MR. ZINNA:  Okay.  If we could turn to the next

10    page of this, please.  Well, okay.

11            This is Page 2, Gina.  Yeah.

12    BY MR. ZINNA:

13    Q.      So if you could take a look at both of these

14    pages, Mr. Fisher.  I can't tell if these are actually

15    different items or if one was like folded up but it's

16    really just the same thing.  Do you know?

17    A.      I think they're pretty much the same thing.  One

18    might be a little taller, for some reason.  It looks

19    like it has more space on the right side on one, so it

20    might have been trimmed or something.

21            Oh, wait.  Oh, it says -- actually, it says one

22    was 11-by-17 and then one is eight-and-a-half-by-eleven.

23    Q.      So before we get to that, are you in possession

24    of the documents shown in these pictures?

25    A.      Yes.
```

Robert Andres Fisher

1    A.      Well, it's not the exact same one, but it's a,

2    you know, different size one.

3    Q.      Can you tell me how it's different in any way?

4    A.      Just the size.

5            MR. ZINNA:  Okay.  Gina, if you would, please,

6    pull up Tab S, and mark it as Exhibit 13.

7            (Exhibit 13 was marked for identification.)

8            MR. ZINNA:  Thank you.

9    BY MR. ZINNA,

10   Q.      So, Mr. Fisher, I'm showing you now a document

11   that's been marked as Exhibit 13.  And this document was

12   produced in this case by Marc Jacobs under the Bates

13   number MJI-N-I-R-V-A-N-A, Nirvana, 000330, and the next

14   page of this exhibit is MJI-Nirvana 000332.

15           Have you seen the item in this document before?

16   A.      Yes.  I created it.

17   Q.      What is it?

18   A.      It's a flyer or some kind of -- I think for

19   their record release party up in Seattle.

20   Q.      And how did you come to create this?

21   A.      I was asked to make a flyer to promote the

22   event.

23   Q.      Did you attend the event?

24   A.      No.

25   Q.      The poster says that the party was to take place

Robert Andres Fisher

```
 1   A.      Yes.  If I don't do it now, there -- when can I?

 2   Q.      Okay.

 3           MR. ZINNA:  Gina, would you, please, move to

 4   Tab Z, and mark it as Exhibit 22.

 5           MR. DEIXLER:  Shouldn't that be 21?

 6           TRIAL TECHNOLOGIST:  It is 21.

 7           MR. ZINNA:  Oh, okay.  Thank you.

 8           Sorry about that.

 9           (Exhibit 21 was marked for identification.)

10   BY MR. ZINNA:

11   Q.      So, Mr. Fisher, you are now looking at what's

12   been marked as Exhibit 21, which is a document that's

13   been produced by Nirvana in this case labeled with Bates

14   number NIRVANA-001840.

15           Have you seen this document before?

16   A.      I think I saw it this morning briefly.  We got a

17   package right before the deposition started.

18   Q.      Okay.  So you didn't see this prior to today.

19   A.      Correct.

20   Q.      So I'll represent to you that this is a document

21   that's titled "Acknowledgment" that was signed on

22   January 22nd, 2020, by John Ray, who is senior

23   vice-president of business and legal affairs, according

24   to this document, at UMG Recordings.

25           Do you -- did you know anything about this
```

Robert Andres Fisher

```
 1   document before you got it this morning?

 2   A.      No.

 3   Q.      Will you please take a moment to read it and let

 4   me know when you've finished?

 5   A.      (Witness reviews document.)  Okay.

 6   Q.      Okay.  Do you know -- are you familiar with the

 7   company UMG Recordings, Inc.?

 8   A.      Yes.  I believe that's the label that Nirvana is

 9   on currently, that puts out their releases.

10   Q.      Do you see at the bottom it says that this

11   document -- well, this document is signed by John Ray?

12   A.      Yes.

13   Q.      Do you know John Ray?

14   A.      No.

15   Q.      So you never would have worked with him at your

16   time working with Geffen?

17   A.      No.

18   Q.      Do you know if he ever worked at Geffen?

19   A.      I have -- I have no idea.

20   Q.      Were you contacted about this document by anyone

21   prior to January 22nd, 2020?

22   A.      No.

23   Q.      Other than today, did you discuss this document

24   or any of the contents of it with anyone between

25   January 20th, 2020, and today?
```

Robert Andres Fisher

```
 1   misstate.

 2   A.      I believe it was early '91.

 3   Q.      And did you have a relationship with the members

 4   of the band at that time?

 5           Obviously, everybody who does work for them

 6   probably does not, but did you?

 7   A.      Yes.  They would come into the office and, you

 8   know, we'd originally discuss the package and things.

 9   Q.      And so did you have any kind of direct

10   relationship with Mr. Cobain?

11   A.      Yes.

12   Q.      Can you describe the nature of that relationship

13   in 1991 to me, please?

14   A.      Well, we collaborated on coming up with the

15   album covers and the artwork.

16   Q.      And so would your relationship have been --

17   would you characterize it as just a professional

18   relationship or also a personal relationship?

19   A.      It was a professional relationship.  We didn't

20   hang out outside of that really.

21   Q.      Okay.

22           MR. ZINNA:  If we could take one more quick

23   break.  I know we just had one, but I probably just need

24   to organize myself and maybe do a quick check to see if

25   there's anything I missed, and then I may be able to
```

Robert Andres Fisher

```
1   you had made the smiley face T-shirt as a work for hire,

2   that, nevertheless, because of a drawing you had made in

3   art school, she requested the payment to you of monies?

4        Did you know that?

5   A.    I --

6        MS. DE BRUYN:  Objection.  Form.

7   Mischaracterization.

8   BY MR. DEIXLER:

9   Q.    Did you know that?

10  A.    No, never heard of that.

11  Q.    Did she discuss with you -- did you -- did it

12  come to your attention that a solicitation for the

13  payment of money to a witness under a Subpoena violates

14  federal laws?

15       MS. DE BRUYN:  Objection.  Form.

16  Mischaracterization.

17  BY MR. DEIXLER:

18  Q.    Can you answer the question, sir?

19  A.    Oh.  No, I'm not aware of this.

20  Q.    Okay.  This time is the first you heard of it.

21       Let me -- let me go back a little bit and make

22  sure I have an understanding of what -- of what your

23  career has consisted of and what it is -- what it is

24  now.

25       At one point this afternoon you said you had
```

Robert Andres Fisher

```
 1   worked with Nirvana for 30 years.

 2           When is the last time you did anything with

 3   Nirvana?

 4   A.      Like a -- within a year, I believe.

 5   Q.      And what was that work?

 6   A.      It was an album release of Live and Loud.

 7   Q.      And that was in your role as an independent

 8   contractor working through your -- through your company

 9   that you and your wife own?

10   A.      Yes.

11           MR. ZINNA:  Objection to form.

12   BY MR. DEIXLER:

13   Q.      Now, the first time you did work for Nirvana was

14   when you worked for the David Geffen Company; is that

15   true?

16   A.      I was working at the record company.

17   Q.      And you started working at the David Geffen

18   Company as a member of the staff in 1989 or early 1990;

19   is that true?

20   A.      Yes.

21   Q.      And you reported -- well, you -- there was an

22   office at the time on Sunset Boulevard; is that correct?

23   A.      Correct.

24   Q.      And that's where your office was?

25   A.      Yes.
```

Robert Andres Fisher

```
 1   Q.      And that's where you reported to work every day;

 2   correct?

 3   A.      Yes.

 4   Q.      And that's where your bosses were housed as

 5   well; is that true?

 6   A.      Yes.

 7   Q.      And among your bosses was Robin Sloane; correct?

 8   A.      Yes.

 9   Q.      And Robin Sloane was the person who assigned you

10   your work; correct?

11   A.      For part of the time there, yes.

12   Q.      Yes.  And, in fact, Robin Sloane was the person

13   who assigned you work in connection with Nirvana; is

14   that true?

15   A.      As far as I can remember, yes.

16   Q.      And the way you came to have the opportunity

17   when you were at the David Geffen Company working there

18   to do something for Nirvana is that you approached

19   Ms. Sloane and asked for permission to work on the

20   Nirvana matter; is that true?

21   A.      Yes.

22   Q.      And she agreed; correct?

23   A.      Yes.

24   Q.      You understood that whatever work you did for

25   Nirvana would be subject to her approval; correct?
```

Robert Andres Fisher

```
 1              MR. ZINNA:  Objection to form.

 2              THE WITNESS:  A lot of it was -- yeah, I guess,

 3      in a sense.  She didn't really approve everything.

 4      BY MR. DEIXLER:

 5      Q.      And, in addition to having the work approved by

 6      Ms. Sloane or others at the Geffen Company who were

 7      supervisors, you also had to have the band's approval

 8      for the work you were going to do; isn't that true?

 9      A.      Correct.

10      Q.      And one of the things that you did in connection

11      with starting to understand better what would be

12      satisfactory to the band and, therefore, approved by

13      them, is to work to collaborate with them; is that true?

14              MR. ZINNA:  Objection to form.

15              MS. DE BRUYN:  Yeah.

16              THE WITNESS:  Yes.

17      BY MR. DEIXLER:

18      Q.      And the person you collaborated with most

19      extensively was Mr. Cobain; is that true?

20      A.      Yes, more -- more later on.  But early on, it

21      was a lot of the band, more of them.

22      Q.      During 1991, prior to the release of the

23      Nevermind album, is it correct that you and Mr. Cobain

24      collaborated on creative aspects of the album and the

25      promotional materials surrounding the album?
```

Robert Andres Fisher

```
1              MR. ZINNA:  Objection to form.

2              THE WITNESS:  The main album and -- yeah.

3    BY MR. DEIXLER:

4    Q.      And you collaborated with Mr. Cobain.  In fact,

5    he would often come to your office to talk to you about

6    it; isn't that true?

7              MS. DE BRUYN:  Objection.  Form.

8              THE WITNESS:  Not that often.

9    BY MR. DEIXLER:

10   Q.      How often did you and Mr. Cobain meet to discuss

11   his creative ideas regarding the intellectual property

12   that was going to be released by the David Geffen

13   Company bearing the Nirvana name?

14             MR. ZINNA:  Objection to form.

15             THE WITNESS:  We met once in the office and then

16   we had a photo shoot, and I don't remember any others

17   after that.

18   BY MR. DEIXLER:

19   Q.      So, in 1991, it's your best memory that you met

20   with Mr. Cobain on exactly two occasions and no more;

21   correct?

22   A.      I'm not --

23             MS. DE BRUYN:  Objection to form.

24             THE WITNESS:  I'm not saying exactly, no.  There

25   may have been a few other times.
```

Robert Andres Fisher

```
1    BY MR. DEIXLER:

2    Q.     A few other times in your office; correct?

3    A.     No.

4    Q.     Where did you meet?

5    A.     Only once in my -- only once in my office.

6    Q.     Where else did you meet with Mr. Cobain in 1991

7    prior to the release of the Nevermind album?

8    A.     At the photo shoot.

9    Q.     Where else?

10   A.     I'm not sure.  We may have met -- oh, at the

11   recording studio.

12   Q.     Where else?

13   A.     That's all I can remember right now.

14   Q.     When you saw him perform at the Roxy, did you go

15   backstage to talk to him?

16   A.     No.

17   Q.     Was there ever an occasion in which you spoke to

18   him about the album cover for Nevermind?

19   A.     Yes.

20   Q.     Was that in person, on the phone, or in some

21   other fashion?

22   A.     It was in the office in the beginning, probably

23   at the studio where they were recording it, and then on

24   the phone, possibly.

25   Q.     How frequently did you speak to Mr. Cobain on
```

Robert Andres Fisher

```
 1   Nevermind album cover?

 2          MS. DE BRUYN:  Objection to form.

 3          THE WITNESS:  I didn't say they participated in

 4   all of them.  There might have been a phone call with

 5   Kurt and I that the other two weren't there.

 6   BY MR. DEIXLER:

 7   Q.     But you don't remember.

 8   A.     I -- no, I don't remember if they were in the

 9   room or not with him.

10   Q.     When you were -- well, you were approached by

11   Ms. Sloane for -- to do work on a T-shirt in connection

12   with the newly signed Nirvana band; is that true?

13          MS. DE BRUYN:  Objection.  Form.

14          THE WITNESS:  I didn't talk to Mrs. Sloane about

15   a T-shirt.

16   BY MR. DEIXLER:

17   Q.     Who was the person who told you to adapt from

18   the Seven Circles of Hell, the T-shirt that was

19   ultimately created?

20   A.     That would have come from management.

21   Q.     Mr. Silva?

22   A.     I believe so.

23   Q.     So Mr. Silva told you that he wanted you to do

24   work on a T-shirt for the band Nirvana; is that correct?

25          MS. DE BRUYN:  Objection.  Form.  Asked and
```

Robert Andres Fisher

```
 1              MS. DE BRUYN:  Objection.  Form.

 2  BY MR. DEIXLER:

 3  Q.      -- at the Seven Circles of Hell T-shirt and to

 4  make modifications from it, in substance; is that true?

 5              MS. DE BRUYN:  Objection to form.

 6              MR. ZINNA:  Objection to form.

 7              THE WITNESS:  Yes.  He -- that was the -- like

 8  what you would call a creative brief or to-do.

 9              MR. DEIXLER:  Okay.

10  BY MR. DEIXLER:

11  Q.      So Mr. Silva gave you the creative brief of what

12  to do, you didn't check on his creative brief with your

13  employer at the David Geffen Company, you just started

14  to work; is that correct?

15              MS. DE BRUYN:  Objection.  Form.

16              THE WITNESS:  Yes.

17  BY MR. DEIXLER:

18  Q.      And you had a copy of the -- or an original of

19  that T-shirt in your possession; is that right?

20  A.      Yes.

21  Q.      And so you knew what the starting point was;

22  correct?

23  A.      Yes, I was familiar with it.

24  Q.      Okay.  And the starting point included on the

25  front the name of the band in all caps; correct?
```

Robert Andres Fisher

```
 1   A.      No.

 2   Q.      Do you know what that is?

 3   A.      I -- I've heard of it, yes.

 4   Q.      It's a -- it's a -- it's a club in Seattle?

 5   A.      Yes.  I've recently heard about it as one of

 6   the --

 7   Q.      Where did you hear about it?  Where did you hear

 8   about it?

 9   A.      What's that?

10   Q.      Where did you hear about it?

11   A.      Oh.  Well, I heard that people were like

12   thinking that's where an idea came from for it.

13   Q.      Who told you that?

14   A.      It's on the Internet.

15   Q.      It's on the Internet.

16           So back to -- back to your work in West

17   Hollywood at the David Geffen Company to prepare shirts,

18   preparing T-shirts was something that you've done

19   throughout your career, contributing graphics to; isn't

20   that true?

21           MS. DE BRUYN:  Objection.  Form.

22           THE WITNESS:  Not that much at that point.

23   BY MR. DEIXLER:

24   Q.      Well, let's take the broad expanse of your

25   career at David Geffen from '89 to 2000.
```

Robert Andres Fisher

```
 1              On how many occasions did you prepare the
 2     graphics for a T-shirt for a recording artist?
 3     A.      I couldn't tell you at that point.
 4     Q.      In an 11-year period --
 5     A.      It may be none, it may be one or two, but I
 6     don't recall.
 7     Q.      It was -- over an 11-year period, you only did
 8     one or two T-shirts, the Nirvana --
 9     A.      Oh, I thought you said between my beginning in
10     '91.
11     Q.      From the beginning in '91 until you left in --
12     from your beginning in '89 until your departure in 2000,
13     on how many occasions did you assist in preparing the
14     graphics for a T-shirt for recording artists?
15     A.      I couldn't give you a definite number.
16     Q.      What's your best estimate?
17     A.      I really don't want to guess.
18             MR. ZINNA:  Objection to form.
19             THE WITNESS:  Perhaps ten, maybe?  I -- just
20     guessing.
21     BY MR. DEIXLER:
22     Q.      It was part of your job when instructed to
23     either by management or by your bosses at the Geffen
24     Company to prepare graphic art for T-shirts, you would
25     do that; right?
```

Robert Andres Fisher

```
1              MS. DE BRUYN:  Objection to form.

2              MR. ZINNA:  Objection to form.

3              THE WITNESS:  If they would ask me.  If -- not

4     all bands got T-shirts.  But, yeah, if that -- they

5     wanted to make a shirt for a band.

6     BY MR. DEIXLER:

7     Q.     And you understood that the reason that these

8     shirts were prepared were at least twofold.  One was for

9     promotion and the other was for sale at retail or at

10    concerts; correct?

11             MS. DE BRUYN:  Objection to form.

12             MR. ZINNA:  Object.

13             THE WITNESS:  The ones for the label usually

14    weren't for sale.

15    BY MR. DEIXLER:

16    Q.     They were for promotion; correct?

17    A.     Yes.  They were used for the record company to

18    send out and use.

19    Q.     For promotion of the band; correct?

20    A.     Yeah.  You -- yeah.  That's what --

21    Q.     And promotion --

22    A.     -- almost all T-shirts are for.

23    Q.     Right.

24             And the promotion of the band, as well as

25    promotion of the product that the band was offering for
```

Robert Andres Fisher

1  sale at the time; correct?

2  A.     Yes.  You'd put the album cover on a shirt for

3  them and they'd hand them out.

4  Q.     And that was the case in connection with the

5  Nirvana shirt with the smiley face; correct?

6         MS. DE BRUYN:  Objection.  Form.

7         THE WITNESS:  No.

8  BY MR. DEIXLER:

9  Q.     That wasn't handed out for promotion purposes?

10  A.     It was after it was made.  It wasn't the reason

11  I made it.

12  Q.     I'm sorry.  The -- it was handed out after it

13  was made; correct?

14         You can't hand a shirt out until it's made;

15  true?

16  A.     Well, rephrase your question.

17         MS. DE BRUYN:  Objection.  Form.

18         THE WITNESS:  Your question --

19         MS. DE BRUYN:  Argumentative.

20         THE WITNESS:  Your previous question.

21         MR. DEIXLER:  Sure.  Why don't I start again.

22  BY MR. DEIXLER:

23  Q.     You were instructed to create the graphics for a

24  Nirvana T-shirt; correct?

25  A.     Yes.

Robert Andres Fisher

1          MR. ZINNA:  Objection to form.  May --

2          THE WITNESS:  They asked me to make a shirt for

3     them.

4     BY MR. DEIXLER:

5     Q.     And you were told specifically to play off the

6     Seven Circles of Hell T-shirt; correct?

7     A.     Yes.

8     Q.     And your understanding at the time that you

9     received that instruction from Mr. Silva on behalf of

10    the band was that the T-shirts were going to be used for

11    promotion and for retail; correct?

12    A.     Yes.  They were going to sell them and -- at

13    shows and possibly retail as well.

14    Q.     And you were instructed by Geffen to include the

15    Geffen logo on the T-shirts that were going to be used

16    for promotion; is that also true?

17    A.     Yes.  When they adapt -- adopted the shirt for

18    them to use, they asked that I could put the logo on it.

19    Q.     And who asked you to do that?

20    A.     I'm not sure.

21    Q.     But you were asked by a supervisor at Geffen and

22    you did as you were told; correct?

23    A.     I -- I --

24          MR. ZINNA:  Objection to form.

25          THE WITNESS:  It might have been someone -- yes.

Robert Andres Fisher

```
 1            MR. DEIXLER:  Yeah.

 2     BY MR. DEIXLER:

 3     Q.      It was your job to do that.  They told you what

 4     to do, you did it and executed as well as you could;

 5     correct?

 6            MS. DE BRUYN:  Objection.  Form.

 7            THE WITNESS:  Yes.  If they wanted a logo on it,

 8     I would put it on for them.  I wouldn't argue.

 9     BY MR. DEIXLER:

10     Q.      Now, you, if I correctly understand, take the

11     position that you are entitled to the copyright on the

12     smiley face; is that true?

13     A.      Yes.  I'm the creator of it.

14     Q.      And you created it at the time you were at the

15     David Geffen Company?

16            MS. DE BRUYN:  Objection.

17            THE WITNESS:  Yes, I --

18            MS. DE BRUYN:  Asked and answered.

19     BY MR. DEIXLER:

20     Q.      And you created it at the David Geffen -- while

21     you were at the David Geffen Company at the behest of

22     Mr. Silva, who asked you to create a T-shirt; right?

23            MS. DE BRUYN:  Objection.  Form.  Asked and

24     answered.

25            THE WITNESS:  Yes.  I was asked to create -- to
```

Robert Andres Fisher

```
 1   BY MR. DEIXLER:

 2   Q.      Is there another example that you have that

 3   precedes the one you made while you were at the David

 4   Geffen Company that you haven't produced?

 5   A.      No.  This would -- this was what I could find.

 6   Q.      So we now have the totality of all of the

 7   predecessor artwork to the smiley face that appears on

 8   the T-shirt; correct?

 9           MR. ZINNA:  Objection to form.

10           MS. DE BRUYN:  Objection to form.

11           THE WITNESS:  As far as I know at this moment.

12   BY MR. DEIXLER:

13   Q.      And you've conducted a thorough search in

14   response to the Subpoena that was sent by Mr. Zinna and

15   his colleagues; correct?

16   A.      Yes.

17   Q.      So you have no reason to think that you --

18   somewhere in that garage you've got something that's a

19   bit closer to the smiley face that you now claim a

20   copyright to; correct?

21   A.      Correct.

22   Q.      And the copyright -- I'm sorry -- the smiley

23   face which you have shown us the Xeroxed blowup of

24   today, that was one that was absolutely created while

25   you were at the David Geffen Company; correct?
```

Robert Andres Fisher

```
 1              MS. DE BRUYN:  Objection.  Form.  Asked and

 2    answered.

 3              THE WITNESS:  The Xerox was.

 4    BY MR. DEIXLER:

 5    Q.     The smiley face itself with the X eyes, the

 6    tongue askew, that was created while you worked at the

 7    David Geffen Company; right?

 8              MR. ZINNA:  Objection to form.

 9              THE WITNESS:  The Xeroxed blowup was.

10    BY MR. DEIXLER:

11    Q.     You don't have an example that predates the one

12    that you've shown us that you did at the David Geffen

13    Company.  Is that at least true?

14    A.     No, I don't have any more examples from back

15    then.

16    Q.     And can you remember what you did with whatever

17    that predecessor smiley face was?

18    A.     The little, teeny one that I drew?  Is that what

19    you're asking?

20    Q.     Well, whichever one you claim was the one you

21    created before you created the one at the David Geffen

22    Company.  Where is it?

23    A.     No, I -- I --

24              MS. DE BRUYN:  Objection.  Form.

25              MR. ZINNA:  Objection to form.
```

Robert Andres Fisher

```
1            THE WITNESS:  I think you're misunderstanding

2    me.  The one that I showed in the example was a Xerox

3    that I made at the Geffen Company of the little, teeny

4    one.

5            I have no idea where the little one was.  It's

6    an inch big.  So it is lost.

7    BY MR. DEIXLER:

8    Q.     And you presented this smiley face at the time

9    in response to Mr. Silva's instruction that you create

10   this shirt; correct?

11           MS. DE BRUYN:  Objection.  Form.

12           THE WITNESS:  Yes.  I would have put it all

13   together with the type and the back type and sent it

14   over for them to approve.

15   BY MR. DEIXLER:

16   Q.     Well, the type itself was type -- a similar to

17   or identical with the type that appeared on the Seven

18   Circles of Hell T-shirt; correct?

19   A.     Yes, there were similarities.

20   Q.     You weren't -- you weren't the creator, to use

21   your word, of the typeface; correct?

22   A.     No.

23   Q.     And you weren't the creator of the language

24   which was used on the back of that shirt; correct?

25   A.     Correct.
```

```
 1   Q.      And you weren't the creator of the word
 2   "Nirvana" in caps in that particular typeface; correct?
 3   A.      Correct.
 4   Q.      And the smiley face that you drew was the smiley
 5   face -- well, let me ask about that.
 6           The smiley face that appears on the T-shirt, was
 7   that something that you drew at the David Geffen
 8   Company?
 9   A.      I'm not sure where -- exactly where I drew it,
10   but I brought it in and Xeroxed it there.
11   Q.      With the idea that it would be used on the
12   Nirvana T-shirt; correct?
13   A.      Correct.
14   Q.      In response to Mr. Silva's instructions;
15   correct?
16   A.      Yes.
17   Q.      In your capacity at the David Geffen Company; is
18   that also true?
19           MS. DE BRUYN:  Objection.  Form.
20           THE WITNESS:  By "capacity," what do you mean?
21   BY MR. DEIXLER:
22   Q.      You were working at the David Geffen Company and
23   providing your services for pay to a -- to the David
24   Geffen Company in service of its artists signed to its
25   label; is that true?
```

1          MS. DE BRUYN:  Objection.  Form.

2          MR. ZINNA:  Objection to form.

3          THE WITNESS:  Can you -- can you restate that.

4          MR. DEIXLER:  Well, let's see if Ms. Locklear

5     can read it.  Maybe upon hearing it again, I'll think

6     it's no good and I'll try it again.

7          (The court reporter read back the requested

8     portion of the record.)

9          THE WITNESS:  Yes, I was working with artists on

10    the David Geffen Company.

11    BY MR. DEIXLER:

12    Q.    Well, a specific artist, Nirvana, at the

13    direction of Mr. Silva; correct?

14          MS. DE BRUYN:  Objection.  Form.

15          THE WITNESS:  What did Mr. Silva direct?

16    BY MR. DEIXLER:

17    Q.    That you make a T-shirt that played off the

18    Seven Circles of Hell.  I think we've established that,

19    haven't we?

20    A.    Yes.  But the way you asked was a little

21    confusing.  Sorry.

22    Q.    I apologize for any confusion.

23          So you created different versions of the smiley

24    face for consideration by the David Geffen Company,

25    Mr. Silva, and the band.

Robert Andres Fisher

```
 1              MS. DE BRUYN:  Objection.  Form.

 2   BY MR. DEIXLER:

 3   Q.      Is that true?

 4   A.      They were not for the David Geffen Company.

 5   Q.      They were just for Nirvana; correct?

 6   A.      Yes.  I do a lot of experimenting first before I

 7   show stuff a lot of times.  So I do different versions.

 8   Q.      So it was your goal to create a version that

 9   would be satisfactory to the band Nirvana; correct?

10   A.      Correct.

11   Q.      And so one of the versions that you created had,

12   instead of X eyes, dollar-sign eyes; is that true?

13   A.      Yes.

14   Q.      And the notion of the dollar sign was something

15   that had been in discussion between yourself and

16   Mr. Cobain regarding his conception of the --

17              MS. DE BRUYN:  Objection.

18   BY MR. DEIXLER:

19   Q.      -- Nevermind album cover; isn't that true?

20              MS. DE BRUYN:  Objection.  Form.

21              THE WITNESS:  Yes, it was related to our ideas

22   for the cover.

23   BY MR. DEIXLER:

24   Q.      Well, the idea of a dollar on a fishhook, that

25   was -- that was Mr. Cobain's idea, wasn't it?
```

Robert Andres Fisher

```
 1   manufacture of the T-shirt that has the smiley face on

 2   it?

 3           MS. DE BRUYN:  Objection.  Form.

 4           THE WITNESS:  They paid for their 1,400 copies

 5   that they made for -- of it.

 6   BY MR. DEIXLER:

 7   Q.      The receipts that we have been shown in your

 8   deposition, those were all receipts or budgets that were

 9   paid by the David Geffen Company, not by you; correct?

10   A.      Correct.

11           MR. ZINNA:  Objection to form.

12   BY MR. DEIXLER:

13   Q.      You didn't take a penny out of your pocket to

14   create those shirts; is that true?

15   A.      The ones for David Geffen?

16   Q.      Yes.

17   A.      Correct.

18   Q.      Did you take money out of your pocket when you

19   created the shirts sold at retail by Nirvana?

20           MS. DE BRUYN:  Objection.  Form.

21           THE WITNESS:  I probably already had the pen and

22   I don't -- where the paper was, I don't know.  So I

23   didn't -- I didn't go out and buy -- have to buy

24   anything for it.

25
```

Robert Andres Fisher

1    drew it.  And I remember somehow he sent it to me kind

2    of just as a joke or something to show me.

3    Q.      And when was that, approximately?

4    A.      '92 or '3.  I don't remember.

5    Q.      After the release of the Nevermind album;

6    correct?

7    A.      Yes.

8    Q.      And after the promotional shows that were

9    conducted both in Seattle and at the Roxy; correct?

10           MS. DE BRUYN:  Objection.  Form.

11           THE WITNESS:  Yes.

12   BY MR. DEIXLER:

13   Q.      And after you understood that the shirts for

14   retail had been sold; correct?

15   A.      Yes.

16   Q.      You were aware --

17   A.      Oh, wait.

18   Q.      You were aware --

19   A.      I'm sorry.  I wasn't aware of when the retail

20   shirts were actually sold.

21   Q.      But by 1992, you were aware --

22   A.      Oh.

23   Q.      -- that they had been sold, you didn't know when

24   in '91 they were sold.  Is that fair?

25   A.      I probably knew around then.  I might have seen

Robert Andres Fisher

1   them at another show or something.

2   Q.      And you've been consistently aware since 1991 or

3   1992 that Nirvana smiley T-shirts have been sold around

4   the United States and, really, the world; correct?

5   A.      I've --

6           MR. ZINNA:  Objection to form.

7           THE WITNESS:  I mean, I've seen them around.

8   BY MR. DEIXLER:

9   Q.      And you've seen them around consistently;

10  correct?

11  A.      I guess you could say that, yeah.

12          MR. ZINNA:  Objection to form.

13  BY MR. DEIXLER:

14  Q.      You have a son, don't you?

15  A.      Yes.

16  Q.      And your son has a Nirvana smiley face T-shirt,

17  doesn't he?

18  A.      Yes.  My -- my -- I -- my wife bought him one at

19  Target or something.

20  Q.      And you posted a photograph of him in the

21  T-shirt on your Instagram page.

22  A.      Yes.

23  Q.      Right?

24  A.      Yes.

25  Q.      So there's no question in your mind that there

Robert Andres Fisher

```
 1   were retail sales of this item, the smiley face

 2   T-shirts, for decades; correct?

 3   A.      Yes.

 4   Q.      And at all times it was the smiley face that you

 5   are now claiming that you are the copyright owner to;

 6   correct?

 7   A.      Yes.  I didn't think that I --

 8           MR. ZINNA:  Objection to form.

 9           THE WITNESS:  I wouldn't consider it that I'm

10   now claiming it.  I've never said I didn't do it.

11   BY MR. DEIXLER:

12   Q.      Did you ever tell Mr. Cobain that you believed

13   you were the copyright owner of the smiley face?

14   A.      No.

15   Q.      Did you ever tell any of the band members that

16   you believed you were the copyright owner of the smiley

17   face?

18   A.      No.

19   Q.      Did you ever tell anybody at the David Geffen

20   Company that you believed that you were the owner of

21   the -- the copyright owner of the smiley face?

22   A.      No.

23   Q.      Prior to August 10th, 2020, when a lawyer on

24   your behalf has filed a copyright registration, had you

25   ever made any attempt to register a copyright of the
```

Robert Andres Fisher

```
 1    smiley face?

 2    A.      Not until the one that was recently filed, no.

 3    Q.      Do you have any copyrights that you have filed

 4    prior to August 10th, 2020, in any respect?

 5    A.      No.

 6    Q.      Other than Nirvana, is there any other group

 7    with which you have worked, from 1989 through 2000, at

 8    the David Geffen Company for whom you have claimed that

 9    you are the owner of a copyright of anything that you

10    worked on?

11    A.      No.

12    Q.      We've spoken about your role in -- well, let me

13    back up.

14            We've seen examples of a flyer and a poster that

15    you've been shown which contained announcements about a

16    show in Seattle, as well as a video shoot in Los

17    Angeles.

18            Am I remembering that correctly?

19    A.      Yes.

20    Q.      And each of those documents contain a smiley

21    face; correct?

22    A.      Correct.

23    Q.      And you've said you've created each of those; is

24    that true?

25    A.      Yes.
```

Robert Andres Fisher

1    Q.      And in creating them, did you just design the --

2    well, did you prepare or originate the words that appear

3    on that -- on each of those items?

4    A.      No.

5    Q.      That was dictated to you by somebody?

6    A.      Yes.

7    Q.      By whom?

8    A.      Depending on which one, I -- it would have

9    come -- I don't know where it would have come from.

10   Q.      Well, it came either from the band through its

11   management or through your bosses at the David Geffen

12   Company or both; correct?

13   A.      Correct.  Could be.

14   Q.      And -- well, what's your memory?  If it isn't

15   David -- if it isn't the David Geffen Company and it

16   isn't the band through Nirvana, who else do you think

17   would have been in a position to instruct you about

18   putting out these flyers?

19   A.      It would have been either management or the band

20   or someone at David Geffen, yes.

21   Q.      And before these flyers were put out, you

22   submitted them for review either to the David Geffen

23   Company or to the band's management or to both; is that

24   also true?

25   A.      Yes, because --

Robert Andres Fisher

```
 1    back up.

 2          At the time you created these flyers you were

 3    working at the David Geffen Company; correct?

 4    A.      Yes, I was working there.

 5    Q.      And at the time you decided that you would use

 6    the smiley face on each of these documents, it was your

 7    decision to include that on those flyers; correct?

 8    A.      Yes.

 9    Q.      And you understood that at the bottom of those

10    flyers there was a reference to the David Geffen

11    Company; correct?

12    A.      On the one, I believe, yes.

13    Q.      And there was no reference specifically to you;

14    is that true?

15    A.      Reference how?

16    Q.      In any way, that you were the creator or, better

17    still, the copyright owner.

18    A.      No, I didn't -- no.

19    Q.      Why didn't you indicate at that time that you

20    were the copyright owner?

21          MR. ZINNA:  Objection to form.

22          MS. DE BRUYN:  Yeah.

23          THE WITNESS:  I made that for Nirvana to use.

24          MR. DEIXLER:  Okay.

25
```

Robert Andres Fisher

```
1    BY MR. DEIXLER:

2    Q.      So you made these flyers for Nirvana to use and

3    didn't make a claim that you were the copyright owner at

4    that time.

5            Do I understand that correctly?

6    A.      Correct.  I was not holding a copyright for it.

7    Q.      And it's also true that you were working in your

8    capacity at the David Geffen Company at the time you

9    were making these things for Nirvana and not claiming a

10   copyright ownership; is that also true?

11           MS. DE BRUYN:  Objection.  Form.

12           THE WITNESS:  What was the question again?  I'm

13   sorry.

14           MR. DEIXLER:  If you could read it back,

15   Ms. Locklear, I would appreciate it.

16           (The court reporter read back the requested

17   portion of the record.)

18           THE WITNESS:  Yes, I was working at the Geffen.

19   BY MR. DEIXLER:

20   Q.      At the Geffen Company in service of the Nirvana

21   album; is that right?

22           MS. DE BRUYN:  Objection.  Form.

23           THE WITNESS:  I was working on the album and

24   everything at that time, yes.

25
```

Robert Andres Fisher

```
 1   BY MR. DEIXLER:

 2   Q.      You've used the word "at" when talking about the

 3   David Geffen Company and your work there, that you were

 4   working at the David Geffen Company.

 5           Is the choice of that preposition important in

 6   your sense of where you were working?

 7           Were you working for the David Geffen Company or

 8   just simply located at the David Geffen Company?

 9   A.      I was working for them.  They were paying.

10   Q.      And is it your memory that you never had a

11   written agreement with the David Geffen Company?

12           MS. DE BRUYN:  Objection.  Form.

13           MR. ZINNA:  Objection to form.

14           THE WITNESS:  I do not remember signing one

15   ever, no.

16   BY MR. DEIXLER:

17   Q.      You may have and you've forgotten or you're

18   certain that there's no --

19   A.      I may have --

20   Q.      -- way you signed any agreement?

21   A.      I may have and forgotten.

22           MR. ZINNA:  Objection to form.

23   BY MR. DEIXLER:

24   Q.      Now, other than Ms. Sloane, who else did you

25   report to when you were working for the David Geffen
```

Robert Andres Fisher

```
 1   correct?

 2   A.      Yes.

 3   Q.      And they had to give you approvals for you to

 4   perform whatever services you were going to perform;

 5   correct?

 6           MS. DE BRUYN:  Objection.  Form.  Asked and

 7   answered.

 8           THE WITNESS:  They would -- they would

 9   approve -- have to approve what?  I'm sorry.

10   BY MR. DEIXLER:

11   Q.      For you to provide services, you had to get

12   their approval; correct?

13           I mean, you couldn't just go off and do a Beck

14   Odelay album cover without somebody saying you should do

15   that; right?

16           MR. ZINNA:  Objection to form.

17           THE WITNESS:  Yeah.  For album covers and things

18   like that, yes, you would need to put a budget together

19   and all that.  So, yes, it would have to be approved.

20   BY MR. DEIXLER:

21   Q.      And you didn't receive any separate fee for your

22   work in connection with the design of the Nirvana

23   T-shirt; correct?  It was all part of your overall

24   compensation at Geffen?

25           MS. DE BRUYN:  Objection to form.
```

Robert Andres Fisher

```
 1              THE WITNESS:  I wouldn't say it was part of my

 2    overall compensation, no.

 3    BY MR. DEIXLER:

 4    Q.      Did you receive a separate payment for the

 5    creation of the T-shirt?

 6    A.      No.

 7    Q.      Were you paid, nevertheless, by the David Geffen

 8    Company for the work you were doing there at that time

 9    on that project?

10              MS. DE BRUYN:  Objection to form.

11              THE WITNESS:  On which project are you referring

12    to?

13    BY MR. DEIXLER:

14    Q.      The T-shirt project.

15    A.      Oh.

16    Q.      You got paid for it, didn't you?

17    A.      No.

18    Q.      So let me make sure I understand your point of

19    view.

20              You were working at the David Geffen Company in

21    1991 and one of the things you were working on was a

22    T-shirt for Nirvana; correct?

23              MS. DE BRUYN:  Objection to form.  Asked and

24    answered.

25              This is starting to be harassment.
```

Robert Andres Fisher

```
 1    BY MR. DEIXLER:

 2    Q.      Correct?

 3    A.      Yes.

 4    Q.      And did you receive bimonthly paychecks from the

 5    David Geffen Company?

 6    A.      I'm not -- I don't remember how often they were.

 7    Q.      Were you paid on a piecework basis, that is, if

 8    you did a T-shirt, you'd get X dollars, and if you did

 9    an album cover, you'd get Y dollars --

10    A.      No.

11    Q.      -- or did you receive a fixed amount of money?

12    A.      No.

13    Q.      How were you paid?

14    A.      A paycheck, I guess.  I would get a check.  I'm

15    not sure how often, though.

16    Q.      I see.

17            So you'd get a check bimonth -- weekly,

18    bimonthly, or monthly.  Is that fair?

19    A.      Yes.

20    Q.      And it was at a fixed amount; correct?

21    A.      During the freelance time, I'm not sure if it

22    was like they counted the hours you were there or

23    something.  But I'm --

24    Q.      I see.

25            What was the -- when were you there in the
```

Robert Andres Fisher

```
 1   fulfilling his -- what he wanted to do.

 2   BY MR. DEIXLER:

 3   Q.      Can you think of a time when Mr. Cobain asked

 4   you to do something in connection with the graphics

 5   relating to either promotional material, T-shirts, album

 6   covers, or packaging where you didn't do as he directed?

 7           MR. ZINNA:  Objection to form.

 8           THE WITNESS:  No, nothing comes to mind.

 9   BY MR. DEIXLER:

10   Q.      Same question with management:  Can you think of

11   an instance in which management gave you any direction

12   regarding a T-shirt, album cover, packaging, or

13   promotional materials where you didn't follow their

14   direction?

15           MS. DE BRUYN:  Objection to form.

16           MR. ZINNA:  Objection to form.

17           THE WITNESS:  Nothing comes to mind.

18   BY MR. DEIXLER:

19   Q.      Again, in connection with Nirvana only at the

20   moment, was there a time where you received a direction

21   from Ms. Sloane or any superior of yours at the David

22   Geffen Company regarding a T-shirt, packaging, an album

23   cover, or promotional materials where you didn't follow

24   that direction?

25           MS. DE BRUYN:  Objection to form.
```

Robert Andres Fisher

```
 1              MR. ZINNA:  Objection to form.

 2              THE WITNESS:  Can you repeat -- repeat the

 3      question, please.

 4              MR. DEIXLER:  Ms. Locklear will do that, I'm

 5      sure.

 6              (The court reporter read back the requested

 7      portion of the record.)

 8              THE WITNESS:  I don't remember any.

 9      BY MR. DEIXLER:

10      Q.      Let me ask you about the other bands that you

11      worked for from '89 to 2000 when you were with the David

12      Geffen Company.

13              Can you give me a sample of those bands?

14      A.      Urge Overkill, Beck, Morphine, That Dog.

15      Q.      I think you should go slower because, you know,

16      we don't want to hospitalize Ms. Locklear.

17      A.      Okay.

18      Q.      Morphine?

19      A.      That Dog.  God, there were so many.

20      Q.      Wheezer?

21      A.      Well, Wheezer was after.

22              Tyketto, The Throbs.  Oh, I worked on some Black

23      Crowes things.  I worked for Slayer and Danzig.  That's

24      all I can remember really right now.

25      Q.      And were the services that you provided for each
```

Robert Andres Fisher

```
 1    of those ten or so bands similar in kind to the services

 2    you provided to Nirvana?

 3    A.      Similar in what way?

 4    Q.      Similar in any way.  That is, you did graphic

 5    work --

 6    A.      Oh.  Yes, it was -- it would have been mainly

 7    working on --

 8            MR. ZINNA:  Objection to form.

 9            THE WITNESS:  -- working on their album

10    packaging.

11    BY MR. DEIXLER:

12    Q.      Did you do any promotional items for them?

13    A.      Yeah.  A lot of times they would get posters and

14    things like that.  One-by-one's.  Singles.

15    Q.      Any T-shirts, sweatshirts, hats?

16    A.      Yeah.

17    Q.      Which artists?

18    A.      Urge Overkill, I know I did a shirt.

19            MR. ZINNA:  Objection to form.

20            THE WITNESS:  I don't remember them all.  I

21    don't know.  It was a long time ago.

22    BY MR. DEIXLER:

23    Q.      As to these ten bands with whom you worked while

24    you were at the David Geffen Company, did you make a

25    claim to copyright ownership for any of those bands?
```

Robert Andres Fisher

```
 1    A.      No.

 2            MR. ZINNA:  Objection to form.

 3    BY MR. DEIXLER:

 4    Q.      Is there any work that you did at the David

 5    Geffen Company for which you claim copyright rights

 6    other than in connection with the smiley face for

 7    Nirvana?

 8            MS. DE BRUYN:  Objection to form.

 9            THE WITNESS:  No.

10    BY MR. DEIXLER:

11    Q.      Let me show you what we'll mark as Exhibit 205.

12            (Exhibit 205 was marked for identification.)

13            MS. MOSES:  Gina, this is Tab 29.

14            MR. DEIXLER:  It needs to be flipped.

15            There you go.

16    BY MR. DEIXLER:

17    Q.      Have you seen this document before today,

18    Exhibit 205?

19    A.      I don't believe so.

20    Q.      I'll represent to you that it has been

21    introduced into evidence in the deposition of Lee Brayer

22    and it is a drawing by Kurt Cobain.

23            I'd like to call your attention to the eyes of

24    this figure.  Would you describe what they are?

25    A.      They look like they're crossed out X's.
```

Robert Andres Fisher

```
 1  interest in the work you did?

 2          MS. DE BRUYN:  Objection to form.

 3  BY MR. DEIXLER:

 4  Q.      Whereas, you have for your work on Nirvana.

 5          MS. DE BRUYN:  Objection.  Form.

 6          THE WITNESS:  What did I do for other bands that

 7  I --

 8  BY MR. DEIXLER:

 9  Q.      Why haven't you claimed -- why haven't you

10  claimed the copyright interest in the work you did in

11  '91 at the David Geffen Company for other bands while

12  having done so for Nirvana?

13          MS. DE BRUYN:  Objection to form.

14          THE WITNESS:  There's been no need to.

15  BY MR. DEIXLER:

16  Q.      I don't understand.  What do you mean?

17  A.      There's -- there's -- there's been no need to.

18  Q.      What do you mean by that?

19  A.      There's nothing -- pardon?

20  Q.      What do you mean by that, there was no need to?

21  A.      There's nothing that I would feel I would want

22  to copyright.

23  Q.      And why is it that there's nothing that you did

24  for other bands that you feel you'd want to copyright?

25  A.      If it was done within the scope of --
```

Robert Andres Fisher

```
 1            MR. ZINNA:  Objection to form.

 2            THE WITNESS:  If it was done within the work for

 3     Geffen, there would be no need to.

 4     BY MR. DEIXLER:

 5     Q.     And that was because the work that you did for

 6     Geffen was work for hire?

 7            MS. DE BRUYN:  Objection to form.

 8            MR. ZINNA:  Objection to form.

 9            THE WITNESS:  I'm not exactly sure the total

10     meaning of work for hire.  But commissioned by Geffen, I

11     guess you could say, they were paying for it.

12     BY MR. DEIXLER:

13     Q.     And wasn't Geffen paying for the work you did

14     for Nirvana?

15            MS. DE BRUYN:  Objection to form.

16            MR. ZINNA:  Objection to form.

17            THE WITNESS:  Some of it, yes.

18     BY MR. DEIXLER:

19     Q.     And some of it not?

20            MS. DE BRUYN:  Objection to form.

21            THE WITNESS:  Yes.

22            MR. DEIXLER:  Okay.

23     BY MR. DEIXLER:

24     Q.     So tell me -- I guess I didn't understand this.

25            What work did you do for Nirvana for which you
```

Robert Andres Fisher

```
 1    were not paid by Geffen?

 2    A.      Well, for instance, a T-shirt, probably did like

 3    backstage passes and laminates, and things like that,

 4    where management would just call and ask me to put

 5    something together for them that didn't go through

 6    Geffen.

 7    Q.      I see.

 8            And you would send an invoice to anybody?

 9    A.      No.

10    Q.      Did you ask to be paid in any way?

11    A.      No.

12    Q.      You waited 29 years before you made this claim;

13    right?

14            MR. ZINNA:  Objection to form.

15            MS. DE BRUYN:  Objection to form.

16            THE WITNESS:  Correct.

17    BY MR. DEIXLER:

18    Q.      Do you believe that Marc Jacobs has infringed on

19    your copyright?

20            MS. DE BRUYN:  Objection to form.

21            MR. ZINNA:  Objection to form.

22            THE WITNESS:  It appears so.

23    BY MR. DEIXLER:

24    Q.      And is it your view that the smiley face which

25    you have claimed a copyright in is something which is
```

**EXHIBIT**

**7**

RL   8/27/20

exhibitsticker.com

Nirvana T-Shirt — Radio lists & Sets

PROD. COST

GEFFEN RECORDS

| Metal DGC | 168. |
| Metal B | 264 |
| Alt DGC | 159. |
| Alt B | 71 |
| | 1305 |

+ padding (1400)

Halli 800 / def 600 { A Retail / Uni / Tower

From the desk of
**Robin Rothman**

NIRVANA TEE SHIRT (FRONT)



NIRVANA TEE SHIRT (FRONT)

EXHIBIT D - PAGE 2

# FLOWER SNIFFIN
# KITTY PETTIN
# BABY KISSIN
# CORPORATE ROCK
# WHORES



NIRVANA TEE SHIRT (BACK)

EXHIBIT D - PAGE 3





**DAVID GEFFEN COMPANY**

**GEFFEN**

AD/MERCH FACSIMILE COVER SHEET

DATE: July 26, 1991
TO: B & H
ATTN: Hadi Salem
FROM: Laurel Steven

TOTAL PAGES SENT: 3

*Virgin Hints of the*

As discussed with Karen, enclosed is a copy of the art for the approximately *loom* 1400 NIRVANA T-shirts that we would like to have you produce. *( art will be larger )*

I would like to have you price them four ways:

1) Black shirt with White imprint   *4.20*
☆ 2) Black shirt with Yellow imprint   *$ 25 screens*
3) Black shirt with Yellow imprint on the front and White imprint on back
4) White shirt with Black imprint   *3.90*

Also, we may want to put the DGC logo on the sleeve instead of on the back - please let me know what the additional cost for this would be.   *.30*

Thank you.

*4.30*
*.30*
*$ 4.60*

*6 screens*
*$ /50*

If you did not receive total pages sent, please call (213) 285-2753 or Fax (213) 275-6933.

EXHIBIT D - PAGE 4










EXHIBIT C



EXHIBIT

9

RL   8/27/20





☆ **Robert Fisher**  📎

Fwd: Smiley Face Lawsuit

To:  Michael Meisel



November 27, 2019 at 1:34 PM

**EXHIBIT**

**11**

RL    8/27/20

Hey Michael,
Hope all is well with you and family

I've been hearing about this case with MJ. If you need any help I'm the one that drew the smiley face logo. It was for a shirt and I know we also used it on the flyer for the Teen Spirit video shoot to get kids to come down. so that helps date it.

If you're involved with this BS at all and need me for anything let me know.
I'd be happy to help.

Best,
Robert



**FLYING FISH STUDIO**
LOS ANGELES

**ROBERT FISHER**
CREATIVE DIRECTOR
OFFICE 818-347-2310
robert@ffstudio.us

**WWW.FFSTUDIO.US**

https://www.instagram.com/flyingfishstudiola/

See More from Mike Wilkinson

EXHIBIT I - PAGE 1

**Robert Fisher**  📎
Exhibit A
**To:** Michael Meisel

✉ Sent -…ffstudio.us   November 27, 2019 at 3:33 PM   

Found the original Xerox blowup of it. Can be carbon dated 😂





☆ **Robert Fisher** 📎
Earlier use of logo

To: Michael Meisel

November 27, 2019 at 5:44 PM

I also used it here for this flyer the week of Aug 17.
I'm 99% sure I originally drew it for the promo tee shirt. I remember doing a few versions one had $ $ for eyes.
Anything I can do to help. Let me know

Robert



Robert Fisher
FLYING FISH STUDIO
818-347-2310
www.flyingfishstudio.us

EXHIBIT I - PAGE 3

Found in NIRVANA LAW SUIT Mailbox

**Michael Meisel**                                 November 27, 2019 at 7:04 PM        
Re: Earlier use of logo
To:  Robert Fisher

Thanks so much.   For now, just sit tight and stay quiet.  We'll speak next week.  Enjoy a great
holiday with your family.

Michael Meisel
SILVA ARTIST MANAGEMENT
Office:  323.856.8226

> On Nov 27, 2019, at 5:44 PM, Robert@ffstudio.us <robert@ffstudio.us> wrote:
>
> I also used it here for this flyer the week of Aug 17.
> I'm 99% sure I originally drew it for the promo tee shirt. I remember doing a few versions one
> had $ $ for eyes.
> Anything I can do to help. Let me know
>
> Robert
>
> <IMG_4016.JPG>
>
>
> Robert Fisher
> FLYING FISH STUDIO
> 818-347-2310
> www.flyingfishstudio.us

EXHIBIT I - PAGE 4

EXHIBIT

12

RL   8/27/20



11 x 17 Poster



8.5 x 11 Flyer



MJI-Nirvana 000330



MJI-Nirvana 000332



...want to take home, a few surprises, people to meet, the band to greet...But nevermind all that, the important part is the music. Hear Nevermind in its entirety and loud.

This invitation admits you and a guest only, and must be presented at the door. Space is limited. 21 & over with I.D.

DAVID GEFFEN COMPANY
© 1991 The David Geffen Company

**EXHIBIT**

**21**

RL   8/27/20

## ACKNOWLEDGEMENT

UMG Recordings, Inc., as successor-in-interest to The David Geffen Company ("Geffen"), acknowledges and agrees as follows:

1.　On or about April 30, 1991, Geffen entered into a recording agreement with Kurt Cobain, Chris (Krist) Novoselic, and David (Dave) Grohl, professionally known as "Nirvana," that has been amended from time to time.

2.　In July or August 1991, while under contract to Geffen, Nirvana began using the following "Smiley Face" design that was included in the following "Happy Face" t-shirt registered for copyright in the name of Nirvana, Inc., Reg. No. VA 564-1:




3.　Geffen acknowledges and agrees that to the best of its knowledge, all copyright and related rights in the Nirvana "Smiley Face" design and "Happy Face" t-shirt design depicted and described above are now and at all times have been owned by Nirvana, Inc. or its successor Nirvana, L.L.C.  For avoidance of doubt, to the extent necessary, Geffen retroactively grants and assigns all right, title and interest in and to the "Smiley Face" design depicted above and the "Happy Face" t-shirt whose design was registered for copyright in the name of Nirvana, Inc., Reg. No. VA 564-166, in 1993, and which includes the "Smiley Face" design, to Nirvana, L.L.C. and its predecessors, effective as of the date that work was created in 1991.

ACKNOWLEDGED, CONSENTED TO AND AGREED:

UMG Recordings, Inc., as successor-in-interest to The David Geffen Company

Dated: _1/22/2020_　　By: _____

John Ray

Senior Vice President, Business & Legal Affairs

-1-

NIRVANA-001840

**EXHIBIT**

**22**

RL   8/27/20

exhibitsticker.com

## <u>ACKNOWLEDGEMENT</u>

The undersigned acknowledge and agree as follows:

1.     In 1991, Kurt Cobain created the following Nirvana "Smiley Face" design:



2.     The Nirvana "Smiley Face" design depicted above was included on a t-shirt called the "Happy Face" t-shirt whose design was registered for copyright in the name of Nirvana, Inc., Reg. No. VA 564-166, in 1993.

3.     For avoidance of doubt, the undersigned acknowledge and agree that all copyright and trademark rights and associated goodwill in the Nirvana "Smiley Face" design depicted above and "Happy Face" t-shirt design described above have at all times been owned by Nirvana, Inc. or Nirvana, L.L.C., that all right, title, and interest in and to said works and associated goodwill  is presently owned by Nirvana, L.L.C., that all written grants and assignments needed to perfect Nirvana, L.L.C'.s ownership of said rights have been made, and, to the extent necessary, are made by this acknowledgment and agreement, such that Nirvana, L.L.C. owns all right, title and interest in the "Happy Face" t-shirt whose design was registered for copyright in the name of Nirvana, Inc., Reg. No. VA 564-166, in 1993, as well as all trademark rights and good will associated with the Nirvana "Smiley Face" design depicted above.

ACKNOWLEDGED, CONSENTED TO AND AGREED, EFFECTIVE AS OF DECEMBER 28, 2018:

Dated: Oct. 11, 2019

*Krist Novoselic*
Krist Novoselic (Oct 11, 2019)

Nirvana, L.L.C.

By: K
*Krist Novoselic*
Krist Novoselic (Oct 11, 2019)

Dated: Oct. 11, 2019

Krist Novoselic

Dated: Oct 11, 2019

*DAN*
David Grohl (Oct 11, 2019)

Dave Grohl

**NIRVANA-000328**

Dated: 10/11/19 _____

Dave Grohl

_____

End of Music, LLC

By: Jonathan Daniel _____

Dated: _____

Courtney Love Cobain

Dated: _____

Frances Bean Cobain

-2-

**NIRVANA-000329**

Dated: _____

_____
End of Music, LLC

By: _____


Dated: _____

_____
Courtney Love Cobain

_____
Frances Cobain (Oct 11, 2019)

Frances Bean Cobain

Dated: __10-10-2019__

NIRVANA-000330